### In Re RETEK INC. SECURITIES LITIGATION.

**This Document Relates
To: All Actions.**

Civil No. 02–4209 (JRT/SRN).

United States District Court,
D. Minnesota.

March 31, 2009.

David R. Stickney and Benjamin Galdston, Bernstein Litowitz Berger & Grossmann LLP, San Diego, CA, Ex Kano S. Sams, II, John Rice, and Bing Zhang Ryan, Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA, Gregg M. Fishbein, Lockridge Grindal Nauen PLLP, Minneapolis, MN, for plaintiffs.

James E. Burns, Jr., Karen Johnson–McKewan, Richard Gallagher, and Eunice Lee, Orrick Herrington & Sutcliffe, San Francisco, CA, Allen W. Hinderaker, Merchant & Gould PC, Minneapolis, MN, James C. Maroulis, Oracle Corporation, Redwood Shores, CA, for defendants Retek Inc., James Murdy, John Buchanan, Steven D. Ladwig, and Gregory A. Effertz.

Jeremy P.M. Thomas, Malta, defendant pro se.

## MEMORANDUM OPINION AND ORDER

JOHN R. TUNHEIM, District Judge.

This is a class action lawsuit alleging securities fraud against defendant Retek Inc. ("Retek") and five individuals alleged to be insiders of Retek. The individually named defendants and the capacities in which they served during the class period are John Buchanan, Chairman of Retek's Board of Directors and former Chief Executive Officer; Steven D. Ladwig, Chief Executive Officer of Retek; Gregory A. Effertz, Senior Vice President and Chief Financial Officer; Jeremy P.M. Thomas, Chief Technology Officer; and James B. Murdy, Controller (collectively, "individual defendants"). The lead plaintiffs, the Louisiana Municipal Police Employees' Retirement System and Steven B. Paradis (collectively, "plaintiffs"), were appointed pursuant to Section 21D of the Exchange Act for the class of shareholders who purchased stock between July 19, 2001 and July 8, 2002 (the "class period").

In their Second Amended Complaint, plaintiffs allege that Retek, acting through the individually named defendants, made materially false statements and omissions during the class period that artificially inflated the value of its stock, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. Plaintiffs claim that each of the individual defendants is individually liable under these provisions as direct participants in the fraud because "[t]hrough their positions of control and authority as officers of the Company, each of the Insider Defendants was able to and did control the public statements disseminated by Retek." (Second Amended Complaint ("SAC"), Docket No. 271, ¶ 167.) Plaintiffs further allege that each of the individually named defendants is liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as "a controlling person of Retek" with "power and influence ... to engage in illegal conduct" and is therefore "a culpable par-

ticipant in the fraud [it] perpetrated." (*Id.*, ¶¶ 175–79.)

# BACKGROUND

## I. BACKGROUND FACTS

For summary judgment purposes, the Court views the facts and draws reasonable inferences from those facts in a light most favorable to plaintiffs, the non-moving party. *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 775 (8th Cir. 2005). Where not indicated as disputed, the facts below are either undisputed or viewed in a light most favorable to plaintiffs.

Retek is a company that develops and markets supply chain software to retail companies. On July 8, 2002, Retek issued a press release announcing that it had failed to close more than $30 million worth of licensing contracts it had anticipated would close during the second quarter of 2002, and accordingly adjusted downward deferred revenue guidance and withdrew its previous guidance for 2003. (Pl.'s Opp. Mem., Docket No. 655, Ex. 59.) Retek sought to explain its shortfall by stating, "The Company saw sales cycles extend as a result of working with larger customers that have more complex and lengthy procurement processes." (*Id.*) Individual defendant Ladwig added, "We are disappointed with the volume of new business signed in the second quarter, although we expect that most of the business that was pushed out of the second quarter will be closed later this year." (*Id.* (internal quotation marks omitted).) On the next day, July 9, Retek's stock fell from $17.31 to $6.46 per share.

Plaintiffs allege that beginning July 19, 2001, defendants made a series of materially false and misleading statements that artificially inflated the value of Retek's stock.[1] In particular, plaintiffs claim that Retek fundamentally misrepresented the company's true financial condition and misled investors "[b]y recording revenue and deferred revenue in violation of Generally Accepted Accounting Principles ("GAAP")." (Pl.'s Opp. Mem., Docket No. 655 at 2.) Plaintiffs' 10(b) and 10b–5 allegations are based on five Retek ventures or transactions.

### A. The MAI Joint Venture

The first transaction at issue is a joint venture between Retek and a Chinese company called Multi–Asia, Inc. ("MAI"). The MAI transaction sought to "facilitate business-to-business exchanges over the Chinese Internet" between Retek and MAI. (*See* Def. Retek's Supp. Mem., Docket No. 631, Exs. 31–33, 44, 146.) Retek agreed to license its software to MAI, in exchange for a 20% ownership position in the company, or 7.96 million common shares in MAI. (*Id.*, Ex. 31.) Retek valued the MAI stock at approximately $4 million, (*Id.*, Exs. 43, 106), and recorded that value as deferred revenue (*Id.*, Ex. 161).

---

1. Eleven statements remain actionable under the Court's previous Orders: a 7/19/01 Retek Press Release (SAC, Docket No. 271, ¶ 103.); a 07/19/2001 Credit Suisse Analyst Report (*Id.* ¶ 104.); a 7/19/2001 Retek Conference Call (*Id.* ¶ 104.); Retek's 8/14/2001 10–Q (*Id.* ¶ 105.); a 10/17/01 Retek Press Release (*Id.* ¶ 109.); Retek's 11/14/2001 10–Q (*Id.* ¶ 114.); a 1/10/02 Retek Press Release (*Id.* ¶ 116.); a 1/22/02 Retek Press Release (*Id.* ¶ 118.); Retek's 3/28/02 10–K (*Id.* ¶ 127.); a 4/17/02 Retek Press Release (*Id.* ¶ 130.); and Retek's 5/15/02 10–Q (*Id.* ¶ 135). As Retek notes, it is presumable that plaintiffs intended to include Retek's 3Q01 10–Q, 1Q02 10–Q, and 2001 10–K as actionable statements. For the purposes of this motion, however, the Court need not consider whether these three statements are, indeed, actionable; plaintiffs fail as a matter of law to establish loss causation for *any* statement during the class period.

Plaintiffs argue that this accounting treatment was improper and that Retek failed to disclose that MAI was struggling financially. In particular, plaintiffs allege that Retek inflated its deferred revenue account by valuing the MAI stock at $4 million, even though there was allegedly no market for the stock and the stock had no value. (Pl.'s Opp. Mem., Docket No. 655 at 23.) Plaintiffs further claim that they relied on these deferred revenue numbers as indicia of Retek's future revenues. Retek later wrote-off the $4 million in deferred revenue, as indicated in its press release in July 2002. (*Id.*, Ex. 59.) Analysts projected this write-off in March and April of 2002, (*id.*, Exs. 167, 169), but plaintiffs nevertheless claim that they suffered economic loss when the write-off was disclosed months later.

### B. A & P Transaction

On March 8, 2000, Retek contracted with The Great Atlantic Pacific and Tea Company ("A & P") to develop A & P's technology upgrade for its grocery stores. Although plaintiffs and defendants disagree as to the characterization of Retek's and A & P's contractual obligations, it is at least clear that the project was determined from the outset to be fluid, with some preliminarily defined terms and payment schedules. It is also clear from the agreement that there was a significant amount of uncertainty as to the time and resources that would be necessary to complete the project.

Under the agreement with A & P, Retek would develop and license software to A &

P to upgrade A & P's computer systems. (Def. Retek's Supp. Mem., Docket No. 631, Exs. 35, 72, 73, 74.) At the time of the agreement, Retek and A & P were uncertain about the exact parameters of A & P's functionality requirements, and some of the work related to the agreements required Retek to define those requirements. (*Id.*, Ex. 35 at RTK23034.) In the original agreement and project plan, Retek estimated that it would take 12,200 development days to finish the project, and A & P was required to pay a $15.6 million development fee for those development days. (*Id.*) Given the uncertainty about A & P's functionality requirements for the new software, the parties agreed that any overrun of 10% would require additional payment by A & P, adjustments to the project scope, or some other "commercially reasonable efforts to manage the variance and agree upon necessary changes to the Project Plan." (*Id.*) Ultimately, it appears undisputed that the scope and size of the project significantly exceeded Retek's estimates, and the terms, payments, and security for the agreement were altered by the parties.

Plaintiffs allege that Retek, through the individually named defendants, improperly overstated license revenue generated from the contract with A & P. (Pl.'s Opp. Mem., Docket No. 655 at 19.) Retek and plaintiffs agree that in order to conform to GAAP, Retek had to recognize revenue from the A & P transaction over the slower of two accounting methods: ratably or percentage-of-completion.[2] Plaintiffs al-

---

**2.** Under the ratable recognition method, which Retek used for revenue garnered from technical advisory services contracts, revenue is recognized in equal parts throughout a specific term, which is often the term of the contract for technical advisory services. For example, if a two million dollar licensing contract was signed with a technical advisory period of 24 months, Retek would recognize $250,000 in revenue in each quarter for two years. Under the percentage-of-completion accounting method, however, Retek would estimate the total costs that would be incurred in completing the project. Throughout the completion of the project, Retek would then recognize revenue based on costs incurred at

lege that recognizing revenue based on the percentage-of-completion of the project was the appropriate method of recognizing revenue from the A & P contract and was the **actual** accounting method that Retek used. (*Id.* at 20.) Plaintiffs argue, however, that Retek falsified documents to indicate that the project was 100% complete and executed "side-letter agreements" with A & P to justify the improper recognition of revenue from the A & P agreement. (*Id.*) Plaintiffs assert that these actions raised cash flow expectations and masked Retek's revenue problems until the July 8, 2002, press release. Retek, however, claims that at the time it entered into the contract with A & P, it decided to recognize revenue ratably over a 24-month period, which Retek claims was the **slower** of the two revenue-recognition options. Retek claims that it then properly recognized revenue over that 24-month period. Moreover, Retek argues that the "side-letter agreements" were merely letters of credit that provided A & P additional security in light of the growing scope and timing of the project. (Def. Retek's Reply Mem., Docket No. 666 at 27.)

## C. The IBM Alliance

Retek also had a strategic business alliance with IBM in which Retek and IBM "agreed to jointly market, sell, and service a comprehensive retail e-business solution consisting of Retek applications and IBM software and hardware technologies." (Def. Retek's Supp. Mem., Docket No. 631, Ex. 161 at 48.) In September 2000, IBM and Retek entered into a Master Relationship Agreement ("MRA"). (Pl.'s Opp. Mem., Docket No. 655, Ex. 20 at RTK00020085.) Under the MRA, IBM agreed to pay a nonrefundable "Advanced Payment" of $20 million for licenses on Retek "New Economy" products, which are referred to specifically in the MRA as Retek's Retail.com and Retail Server Products. (*Id.*, Ex. 20 at RTK00020101 ("IBM agrees to pay you a nonrefundable advance against Retail.com and Retail Server Products to be resold by IBM pursuant to the terms hereof. Such advance shall be in the amount of $20,000,000 (the "Advanced Payment")....").) The MRA also obligated Retek to port its New Economy products to IBM's DB2 platform. On September 7, 2000, Retek and IBM jointly issued a press release announcing the alliance, which they targeted to "generate[ ] revenues of more than $1 billion by 2003 for the two companies." (*Id.*, Ex. 19.)

Plaintiffs allege that defendants made positive statements during the class period about its strategic alliance with IBM, even though defendants allegedly knew the alliance was effectively "dead" as of September or October of 2001. Moreover, plaintiffs claim that Retek abandoned its contractual obligations under the MRA by refusing to port some Retek products to the DB2 platform. Finally, plaintiffs have expanded their allegations of Retek's misrepresentations regarding the relationship with IBM, and now challenge Retek's accounting method for the $20 million Advanced Payment from the MRA.

## D. Sainsbury's and Accenture

In 2001 and 2002, Retek signed multiple contracts with British grocer Sainsbury's, which was overhauling its computer technology. (*See* Def. Retek's Supp. Mem., Docket No. 631, Exs. 88, 25, 26.) Sains-

certain milestones compared to the total estimated costs at completion. Retek stated that it recognized revenue under the percentage-of-completion method for contract development services. Under this accounting method, Retek recognized as deferred revenue amounts received in advance of performance. (Def. Retek's Supp. Mem., Docket No. 631, Ex. 161 at 19.)

bury's had created an entity, Swan Infrastructure plc ("Swan"), to coordinate the overhaul and to purchase new systems. (*Id.*, Exs. 152 at 41, 147 at 388:25–389:3.) Retek claims that Swan, in turn, subcontracted with Accenture to manage the process.[3] (*Id.*, Ex. 147 at 388:25–389:3.) Plaintiffs argue, however, that Swan was merely "Accenture's financing arm for Sainsbury's." (Pl.'s Opp. Mem., Docket No. 655 at 43.)

Plaintiffs challenge Retek's accounting for two of the contracts between Retek and Swan: a contract in which Swan purchased a Retek Fulfillment Planning product for $10.475 million and a contract in which Swan purchased a product called Retek Store Systems ("RSS") for £5,950,000. (*Id.*, Exs. 10, 21, 22, 110.) Plaintiffs claim that Retek improperly reported revenue from the Sainsbury's contracts because Accenture "pre-purchased" the contracts in order to assist Retek in making its quarterly revenue figures when Sainsbury's balked at payment on Retek's timeline. As a consequence of these pre-purchases, plaintiffs argue that Accenture's payments were refundable and not recognizable by Retek in their financial statements.

### E.  EPAM/HVI Venture

The final transaction at issue arose out of Retek's desire to enter a software market that EPAM, a well-known software manufacturer, had established in Europe. Plaintiffs and defendants concede that the transaction was complex, but the characterization of the nature of the transaction is disputed. Defendants claim that the EPAM venture was an arms-length transaction. Plaintiffs assert, however, that the venture was a related-party loan from Retek's subsidiary to Retek through EPAM, designed to augment Retek's deferred revenue and revenue numbers.

The EPAM transaction had three parties: Retek, EPAM, and Henderson Ventures, Inc. ("HVI"), with whom Retek had a previous business relationship. (*See* Def. Retek's Supp. Mem., Docket No. 631, Ex. 161 at 10) ("On April 2, 2001, [Retek] signed a stock purchase agreement, a warrant agreement, and software development and distribution agreement with [HVI], a retail enterprise solution developer.") The oral agreement among the parties provided that EPAM would attempt to resell Retek software in markets in which EPAM had a strong presence. HVI would finance EPAM's initial purchase of Retek software in exchange for a share of the profits from the venture. Accordingly, HVI wired EPAM $8 million, which EPAM immediately sent to Retek as payment for Retek's software. Retek cashed EPAM's check on September 28, 2001, just days before the end of Retek's fiscal quarter. On the same day, Retek, HVI, and EPAM signed a letter agreement to temporarily document the $8 million as a loan from HVI to EPAM and then as a loan from EPAM to Retek. On October 4, 2001, HVI and EPAM executed a second letter agreement recharacterizing the $8 million as a refundable royalty payment from EPAM to Retek. (Def. Retek's Supp. Mem. Docket No. 631, Ex. 190.) On October 5, 2001, all three parties memorialized the royalty payment in a Reseller Agreement back-dated to September 28, 2001.

Plaintiffs allege that defendants improperly reported the related-party loan from HVI to EPAM to Retek as deferred revenue and later improperly recognized it as

---

**3.**  Notably, Retek had previously entered into a strategic alliance with Accenture in which Accenture became Retek's development partner for "predictive applications." (Def. Retek's Supp. Mem., Docket No. 631, Ex. 161 at 10.) ·

revenue. That is, plaintiffs argue that under GAAP, no revenue should have been recognized prior to execution of a definitive agreement and receipt of the software. Plaintiffs further argue that Retek failed to disclose that the true source of the money was a "loan" from HVI, a related party.

## II. PROCEDURAL HISTORY

The parties have filed extensive pre-trial motions in this case. On March 30, 2004, this Court granted defendants' motion to dismiss plaintiffs' original complaint on the ground that plaintiffs' allegations, pled on information and belief, did not satisfy the heightened pleading requirements of Section 21D(b)(1) of the Exchange Act, 15 U.S.C. § 78u–4(b), enacted as part of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See In re Retek Inc. Sec. Litig.* ("*Retek I* "), No. 02–4209, 2004 WL 741571, at *6–9 (D.Minn. Mar. 30, 2004). The Court found that the complaint did not specifically plead the facts giving rise to defendants' alleged fraud, nor did it state with particularity all the facts on which the plaintiffs' allegations were formed. *Id.* Plaintiffs filed an amended complaint attaching fifteen pages of interview summaries from seventeen confidential witnesses ("CWs") in an attempt to meet the heightened pleading requirements.

On March 7, 2005, this Court granted in part defendants' motion to dismiss the amended complaint. *In re Retek Inc. Sec. Litig.* ("*Retek II* "), No. 02–4209, 2005 WL 1430296 (D.Minn. Mar. 7, 2005). Specifically, the Court granted the motion to dismiss the negative sales trend allegations. Plaintiffs argued that Retek's deteriorating sales environment made it fraudulent for Retek to make optimistic statements regarding its business and prospects in 2001 and 2002, but the Court

held that plaintiffs failed to plead that such a negative sales trend occurred. The Court also dismissed claims regarding a failed joint venture with Performance Retail because plaintiffs did not allege any false statements implicating this venture. The Court denied the motion to dismiss in all other respects. In so holding, the Court found that plaintiffs had sufficiently alleged that defendants made false statements regarding the IBM alliance, MAI, AOL, and A & P transactions.

Defendants later brought an additional motion to dismiss, which the Court denied on October 21, 2005. Defendants argued that plaintiffs' theory of loss causation was identical to that rejected by the United States Supreme Court. *See Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). The Court denied the motion but noted that plaintiffs' fraud theory rested upon a thread of causation that is "long and somewhat tortured." *In re Retek Inc. Sec. Litig.* ("*Retek III* "), No. 02–4209, 2005 WL 3059566, at *4 (D.Minn. Oct. 21, 2005). On March 22, 2006, 236 F.R.D. 431 (D.Minn.2006), the Court granted plaintiffs' motion to certify a class. Finally, on January 3, 2007, the Court granted defendants' motion to dismiss the AOL claims, negative trend allegations as pled in an amended complaint, and the 10b–5 claim against Steven Ladwig. *In re Retek Inc. Sec. Litig.* ("*Retek IV*"), No. 02–4209, 2007 WL 14352 (D.Minn. Jan. 3, 2007).

Retek and individual defendants now separately move for summary judgment on all remaining counts. Specifically, Retek moves for summary judgment as to Exchange Act Section 10(b) and SEC Rule 10b–5 allegations by plaintiff; four individual defendants bring summary judgment motions as to Section 10(b), SEC Rule 10b–5 claims, and control person liability claims under Section 20(a); and individual

defendant Jeremy P.M. Thomas brings a *pro se* motion for summary judgment as to Section 10(b), SEC Rule 10b–5 claims, and control person liability claims under Section 20(a). Further, defendants jointly move to exclude the testimony of plaintiffs' expert, Dr. Scott Hakala. For the reasons discussed below, defendants' motions for summary judgment are granted in all respects, and defendants' motion to exclude the expert testimony of Dr. Hakala is denied as moot.

## DISCUSSION

## I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, to avoid summary judgment, plaintiffs must adduce evidence from which a rational trier of fact could find in plaintiff's favor on each element of a claim.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325–28, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. SECTION 10(B) AND SEC RULE 10B–5 CLAIMS

Section 10(b) of the Securities Exchange Act of 1934 forbids "any person … [t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b–5, which provides an implied private cause of action under section 10(b), states:

It shall be unlawful for any person …

(a) to employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. There are six elements of a 10b–5 action: (1) a material misrepresentation (or omission); (2) scienter, or intent to deceive, manipulate, or defraud; (3) a connection with the purchase or sale of a security; (4) reliance (sometimes referred to as "transaction causation"); (5) economic loss; and (6) "loss causation," or a causal connection between the material misrepresentation and the loss. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *see also In re Daou Sys., Inc. Sec. Litig.,* 411 F.3d 1006 (9th Cir.2005). Because plaintiffs fail to establish loss causation for the reasons

given below, the Court will not address the remaining elements.

## A. Loss Causation

The Private Securities Litigation Reform Act ("PSLRA") places the burden on the plaintiff "of proving that the act or omission of the defendant alleged to violate [Section 10(b) ] caused the loss for which plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). In order to recover damages in a securities fraud action, plaintiffs must therefore "adequately ... prove the traditional elements of causation and loss." *Dura,* 544 U.S. at 342–43, 125 S.Ct. 1627.

██ To establish loss causation, the plaintiff must prove (1) that at the time of purchase of the stock, the stock price was inflated as a result of a defendant's material misrepresentations, and (2) that the plaintiff suffered a loss—a deflation in the stock price—when a corrective disclosure revealed the truth of the fraud to the public. *Dura,* 544 U.S. at 343–44, 125 S.Ct. 1627 (citing the Restatement of Torts for the principle that a plaintiff pleading causation and loss may establish a loss "when the facts ... become generally known and as a result share value depreciates."); *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1063 (9th Cir.2008) ("Plaintiffs adequately pled loss causation in *Daou* because their complaint alleged that the market learned of and reacted to this fraud.").

In short, securities-fraud actions are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura,* 544 U.S. at 345, 125 S.Ct. 1627. Recovery is therefore limited by plaintiffs' ability to demonstrate that the **alleged fraud,** and not some other non-fraud factor, caused the loss:

When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

*Id.* at 343, 125 S.Ct. 1627.

Thus, at the summary judgment phase, a plaintiff is required to produce evidence of four things. First, the plaintiff must specify and produce evidence of the statements or omissions that they allege to be misleading. *See* 15 U.S.C. § 78u–4(b)(1). Second, evidence must be presented showing that those misrepresentations artificially inflated the defendant-company's stock price. *Dura,* 544 U.S. at 342–43, 125 S.Ct. 1627. Third, the plaintiffs must show that a later corrective disclosure revealed the relevant truth underlying defendants' earlier allegedly misleading statements. *See id.* at 342–44, 125 S.Ct. 1627. This Court has previously noted that there is uncertainty in the case law about how specific such a disclosure must be. *See In re Retek Inc. Sec. Litig.* ("*Retek III* "), No. 02–4209, 2005 WL 3059566, at *3 (D.Minn. Oct. 21, 2005). Finally, the plaintiffs must produce evidence showing an economic loss based on the drop in price of company stock. 15 U.S.C. § 78u–4(b)(4).

Plaintiffs claim that the corrective disclosure in this case was the July 8, 2002, press release, which states in relevant part:

The Company saw sales cycles extend as a result of working with larger customers that have more complex and lengthy procurement processes. The total amount of the license revenue that was anticipated to close, but delayed or deferred, was approximately $30 million.

As a result, deferred revenue is expected to decline approximately \$13 to \$14 million. This reduction includes the balance sheet reversal of \$4 million in non-cash deferred revenue associated with Multi Asia, Inc. (MAI), a Hong Kong-based exchange focused on the Chinese retail and supplier market.

(Pl.'s Opp. Mem., Docket No. 655, Ex. 59.)

The only venture directly addressed in the press release is MAI. Plaintiffs claim, however, that the press release **indirectly** disclosed Retek's alleged misrepresentations with respect to the remaining four transactions at issue. Case law is clear that the relevant truth may be disclosed directly or indirectly. *See Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 579 (N.D.Tex. 2007). As one district court noted, "[w]hen fraud is revealed through indirect disclosure, 'plaintiffs must provide proof that the market recognized a relationship between the event disclosed and the fraud' in order to establish loss causation." *Id.* (quoting *McKowan Lowe & Co. v. Jasmine, Ltd.*, Nos. Civ. 94–5522 RBK, Civ. 96–2318 RBK, 2005 WL 1541062, at *8–9 (D.N.J. June 30, 2005)); *see also In re Omnicom Group, Inc. Sec. Litig.*, 541 F.Supp.2d 546, 553 (S.D.N.Y.2008); *In re Williams Sec. Litig.*, 496 F.Supp.2d 1195, 1266 (N.D.Okla.2007).

In its earlier Order denying Retek's motion for judgment on the pleadings, the Court determined that plaintiffs adequately pled "an allegedly corrective disclosure followed by a drop in the stock price during the time that plaintiffs owned securities." *Retek III*, 2005 WL 3059566, at *4. The Court reasoned that plaintiffs' allegation that Retek recognized revenue ratably over time suggested "a possible temporal and subject matter connection between the July 8 press release and the previous alleged misrepresentations." *Id.* (citing *Daou*, 411 F.3d at 1006.). The Court concluded that although "the thread of causation may be long and somewhat tortured," the Court had to accept plaintiffs' allegations as true for the purposes of a motion to dismiss, and the plaintiffs had pled enough to survive the motion. *Retek III*, 2005 WL 3059566, at *4. In so holding, the Court cited *In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir.2005), for the proposition that plaintiffs adequately alleged loss causation where Retek's press release revealed the company's "true financial condition." *Retek III*, 2005 WL 3059566, at *4.

Citing the Court's Order, plaintiffs assert that "[l]oss causation is established where there is a stock-price decline after revelations of the company's 'true financial condition.'" (*See* Pl.'s Opp. Mem., Docket No. 655 at 64 (citing *Retek III*, 2005 WL 3059566, at *4).) Plaintiffs contend that they have satisfied their summary judgment burden to establish loss causation because they have presented evidence that the July 8 press release revealed Retek's true financial condition to the public. (*Id.* at 64–66.) Further, plaintiffs argue that they have established loss causation because they have demonstrated a "possible 'temporal and subject matter connection'" between the July 8 press release and defendants' prior misrepresentations. (*Id.* (quoting *Retek III*, 2005 WL 3059566, at *4).) The Court's previous Order, however, reviewed Retek's 12(b)(6) motion to dismiss. Retek has now brought a motion for summary judgment. The motion at issue, the standard of review, and plaintiffs' burden has changed.

### 1. The True Financial Condition Theory

#### a. *In re Daou Systems, Inc. Securities Litigation*

In short, the true financial condition theory permits a plaintiff to properly allege a corrective disclosure revealing the

truth about a company's underlying misrepresentation when the corrective disclosure reveals the company's true financial results and condition, even if the disclosure does not directly identify the misrepresentation. *Daou*, a Ninth Circuit case, appears to be the most-cited case applying the true financial condition theory.

In *Daou*, a plaintiff class brought an action against Daou Systems, claiming that Daou, which created and implemented health care computer networking systems, violated section 10(b) and SEC Rule 10b–5, among other securities laws. *Daou*, 411 F.3d at 1012, 1014. The plaintiffs alleged that Daou claimed to recognize revenue based on the percentage-of-completion method of accounting, but also alleged that Daou misrepresented its financial condition by improperly and anticipatorily reporting income on a lock-step basis without regard to incurred or estimated labor costs. *Id.* at 1012–13. As a result of this improper recognition of income, plaintiffs alleged that the price at which they purchased Daou stock was artificially inflated, and that they would not have purchased the stock at that price had they been aware of Daou's true financial results and condition. *Id.* The district court dismissed the case, finding that the plaintiffs failed to adequately allege loss causation: "Notably, the [complaint] does not allege that there were any negative public statements, announcements or disclosures at the time the stock price dropped that Defendants were engaged in improper accounting practices." *Id.* at 1026.

On appeal, the Ninth Circuit reversed, noting that the plaintiffs' Third Amended Complaint, although it failed to allege specific negative public disclosures, "indicate[d] that the price of Daou's stock fell precipitously after defendants began to reveal figures showing the company's **true financial condition**." *Id.* (emphasis add-

ed). In particular, the court pointed to plaintiffs' allegation that "Defendants further revealed that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables—**the direct result of prematurely recognizing revenue**." *Id.* (internal quotation marks omitted; emphasis original). The plaintiffs went on to allege that the defendants failed to disclose their actual financial figures to analysts to conceal the fact the defendant-company's financials were deteriorating. *Id.* Finally, the plaintiffs quoted in the complaint an analyst who allegedly stated, "When you say one thing on the conference call and report something different on the 10–Q, that raises concern ... **You have got to question whether they are manufacturing earnings.**" *Id.* (internal quotation marks omitted).

The Ninth Circuit concluded that the plaintiffs' allegations, if assumed true, were "sufficient to provide Daou with some indication that the drop in Daou's stock price was causally related to Daou's financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned." *Id.* Notably, the Ninth Circuit arrived at this holding by citing *Dura* for the proposition that a plaintiff who suffered an economic loss is required "to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347, 125 S.Ct. 1627.

In *Dura*, the Supreme Court required that a plaintiff provide notice to a defendant, in accordance with federal pleading rules, of the type of causal connection between a misrepresentation and economic loss that they intend to prove at trial. Although conceding that notice-pleading establishes a low burden on the plaintiff, *Dura* repeated the oft-cited rule that even a " 'short and plain statement' must pro-

vide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* at 346, 125 S.Ct. 1627 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Supreme Court emphasized that the low burden should not be classified as no burden: "[A]llowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the [federal securities] statutes seek to avoid." *Id.* at 347, 125 S.Ct. 1627.

Notably, the reasoning for the *Daou* and *Dura* holdings was based on notice-pleading principles because those courts were addressing motions to dismiss on the pleadings. In light of plaintiffs' reliance on these cases, the true financial condition theory, and this Court's previous Order, it is necessary to focus briefly on the distinction between standards of review for each motion.

### b. Motions to Dismiss and Motions for Summary Judgment

In alleging loss causation under Rule 8(a)(2) a complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *see also Dura,* 544 U.S. at 346, 125 S.Ct. 1627. The Court reviews a defendant's motion to dismiss to determine if, taking the facts alleged in the complaint as true and construing the pleadings in a light most favorable to plaintiff, *see, e.g., Bhd. of Maint. of Way Employees v. Burlington N. Santa Fe R.R.,* 270 F.3d 637, 638 (8th Cir.2001), the plaintiff has stated "a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

*Dura* states that a complaint fails to allege loss causation if it does not provide to defendant "notice of what the relevant loss might be or of what the causal connec-

tion might be between that loss and the misrepresentation." *Dura,* 544 U.S. at 337, 125 S.Ct. 1627. The Ninth Circuit further notes that " '[t]his is not a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of loss causation." *In re Gilead Sci. Sec. Litig.,* 536 F.3d 1049, 1057 (9th Cir.2008) (quoting *Twombly,* 127 S.Ct. at 1965).

By contrast, at the summary judgment stage, the parties have developed the record through discovery and there is an expectation that the parties have had the opportunity to produce evidence supporting their claims and defenses. The Court reviews a defendant's motion for summary judgment to determine whether the plaintiffs have adduced sufficient evidence from which a rational trier of fact could find in the plaintiff's favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325–28, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also id.* at 322, 106 S.Ct. 2548 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party **who fails to make a showing sufficient to establish the existence of an element essential to that party's case,** and on which that party will bear the burden of proof at trial." (Emphasis added)).

As *Dura* acknowledged, Rule 8 simply requires a "short and plain statement of the claim showing that the pleader is entitled to relief," and it should not prove burdensome for a plaintiff who has suffered an economic loss to provide defendant with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura,* 544 U.S. at 347, 125 S.Ct. 1627. *Dura, Daou,* and this Court's previous Order are therefore distinguishable from the instant motion because those opinions addressed a standard of review of a motion to dismiss.

Here, plaintiffs are past the point of placing Retek on notice of what plaintiffs **intend** to prove. That is, the Court is no longer concerned about whether defendants have been put on notice that "plaintiffs claim the July 8 press release as a corrective disclosure and the subsequent fall in stock value as their economic loss." *See Retek III*, 2005 WL 3059566, at *3. Rather, the Court reviews the record to determine whether plaintiffs have adduced evidence such that a rational trier of fact could find in their favor on the issue of loss causation.

■ It is clear that the mere disclosure of disappointing earnings or reduced future guidance is not sufficient to reveal that prior financial statements contained misrepresentations. *See Greenberg v. Crossroads Sys. Inc.*, 364 F.3d 657, 668 (5th Cir.2004). Instead, the plaintiff bears the burden of producing evidence demonstrating a link between a corrective disclosure, public awareness of an alleged misrepresentation, and a drop in company stock price. *E.g., Ryan v. Flowserve Corp.*, 245 F.R.D. 560 (N.D.Tex.2007); *see also Teachers' Retirement Sys. of La. v. Hunter*, 477 F.3d 162, 187 (4th Cir.2007) ("Because Hunter's 2003 complaint did not reveal the 'true facts' of these [allegedly fraudulent] transactions, the 2003 revelations could not have **caused** the plaintiffs' loss.... To allege loss causation in this case, plaintiffs would have to allege that the market reacted to new facts disclosed in June 2003 that revealed [the] previous representations to have been fraudulent." (Emphasis original.)).

Other courts, when presented with motions for summary judgment on the issue of loss causation, have echoed the Court's conclusions. In *Ryan v. Flowserve*, a district court rejected the plaintiffs' true financial condition theory for establishing loss causation at the summary judgment stage, holding:

> Although fraud may be disclosed to the market indirectly-through another event, this adds a step to the loss causation/negative causation analysis. When fraud is revealed through indirect disclosure, plaintiffs must provide proof that the market recognized a relationship between the event disclosed and the fraud in order to establish loss causation.

*Flowserve*, 245 F.R.D. at 579 (citations and internal quotation marks omitted). The *Flowserve* court found that the plaintiffs failed to produce sufficient evidence to create a genuine issue for trial, concluding that there was no evidence indicating that Flowserve's reduced earnings guidance indirectly disclosed to the public the truth of **any** alleged material misrepresentation. *Id.*

In criticizing the plaintiffs' assertion and the plaintiffs' expert's support of the true financial condition theory, the *Flowserve* court continued:

> In effect, Plaintiffs' expert leads the Court to a dangerous precipice. Under his logic, the relatedness tests set forth in *Dura* and *Greenberg* are optional. Rather than follow precedent, a plaintiff, like here, with debatable evidence of fraud can pick the largest stock drop irrespective of the actual reason and still relate the fraud because the stock drop is nevertheless a revelation of the company's true financial health. The "true financial condition" theory, if accepted, threatens to undermine the objective of securities law and disregards precedent.

*Id.* at 573–74.

Other courts have similarly held that a plaintiff may not rely solely on a revelation of a company's true financial condition when attempting to defeat summary judgment. In *In re Williams*, a district court held that at the summary judgment stage,

"if plaintiff asserts that the fraud surfaced 'through disclosure of another event,' he 'must provide proof that the market recognized a relationship between the event disclosed and the fraud.'" *In re Williams Sec. Litig.*, 496 F.Supp.2d 1195, 1266 (N.D.Okla.2007) (quoting *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, Nos. Civ. 94–5522 RBK, Civ. 96–2318 RBK, 2005 WL 1541062, at *8 (D.N.J. June 30, 2005)); *see also In re Omnicom Group, Inc. Sec. Litig.*, 541 F.Supp.2d 546, 553 (S.D.N.Y. 2008). The *Williams* court subsequently granted the defendant's motion for summary judgment because the plaintiff was unable to produce evidence that created a genuine fact issue for trial on loss causation.

Even the Ninth Circuit, after *Daou*, recognized that reliance on the true financial condition theory, without producing evidence of causal connection, is problematic:

> So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market "understood" a defendant's statement precipitating a loss as a coded message revealing the fraud. Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price. Loss causation requires more.

*Metzler Inv. v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir.2008) (citations omitted).

In sum, plaintiffs must produce **evidence** that the market became aware of Retek's alleged misrepresentations as a result of the July 8 press release. The true financial condition theory permits a complaint to survive a motion to dismiss when it places a defendant on notice of how a plaintiff intends to prove that its economic loss was caused by the defendant's material misrepresentation. However, without producing specific evidence demonstrating that the public became aware of an alleged misrepresentation through a corrective disclosure, along with presenting evidence of a consequent deflation of the stock price, a plaintiff cannot satisfy their evidentiary burden at summary judgment.

### 2. Loss Causation and the Five Transactions/Ventures at Issue

■ The Court now turns to the five transactions at issue, noting that the only venture directly addressed in the July 8, 2002, press release was the MAI project. Plaintiffs claim, however, that the press release **indirectly** disclosed Retek's alleged misrepresentation for the remaining IMB, Sainsbury's, A & P, and EPAM/HVI projects.

#### a. The MAI Venture

Plaintiffs allege that Retek's valuation of MAI stock at $4 million and deferred revenue treatment in financial statements made all financial statements for the class period false. Further, since investors relied on deferred revenues as indicia of future revenue, plaintiffs argue that Retek had a responsibility to disclose MAI's financial troubles and the potential that Retek would have to write off the deferred revenue. Retek's treatment of MAI stock as deferred revenue, plaintiffs argue, resulted in inflated deferred revenue numbers in financial statements.

Plaintiffs contend that the corrective disclosure revealing Retek's fraudulent accounting recognition of MAI stock was issued in the July 8 press release: "This reduction [in deferred revenue] includes the balance sheet reversal of $4 million in non-cash deferred revenue associated with Multi Asia Inc. (MAI), a Hong Kong-based

exchange focused on the Chinese retail and supplier market." (Def. Retek's Supp. Mem., Docket No. 631, Ex. 161.) There are two problems with plaintiffs' characterization of the press release as a corrective disclosure. First, it is questionable whether this statement reveals any "relevant truth" about Retek's accounting practices for MAI stock. Second, even if one could characterize the press release as revealing the alleged "truth" about Retek accounting practices, the press release was not the first time the "relevant truth" was revealed.

It is difficult to conclude that Retek's statement "revealed" anything but a write-off of deferred revenue.[4] A corrective disclosure reveals the truth behind the alleged misrepresentation to the market and any subsequent economic loss may be attributed to the earlier misrepresentation. *In re Williams Sec. Litig.*, 496 F.Supp.2d 1195, 1263 (N.D.Okla.2007). The press release statement is quite simple: "This re-

duction [in deferred revenue] includes the balance sheet reversal of $4 million in non-cash deferred revenue associated with Multi Asia Inc. (MAI), a Hong Kong-based exchange focused on the Chinese retail and supplier market." Plaintiffs' challenge is to produce evidence that this statement reveals improper accounting methods. Rather, it seems that Retek accounted for ownership in MAI as deferred revenue (analysts indicate that this accounting treatment was accomplished by debiting $4 million from the assets side of the balance sheet), and when the investment struggled because of MAI financial troubles, Retek wrote off the deferred revenue. On the other hand, cases that find a revelation of "relevant truth," for example, often discuss the type of error or misrepresentation involved. *See Catogas v. Cyberonics, Inc.*, 292 Fed.Appx. 311, 315 (5th Cir.2008) ("[S]uch news did not reveal anything regarding the accounting of options that had not already been disclosed to the investing

4. Indeed, nearly every case cited by the parties, regardless of whether the case is cited in favor or against the Court's proposition, dealt with corrective disclosures that directly addressed or at least suggested the possibility of fraudulent activity. *See In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1053–55 (9th Cir.2008) (discussing the influence of a FDA Warning Letter about the defendant's off-label marketing of a drug and the defendant's continued representations about the strong sales of the drug); *Metzler*, 540 F.3d at 1055, 1059 (discussing the disclosure, in a *Financial Times* story, of a Department of Education investigation into defendant's falsification of financial aid applications and a subsequent press release reducing earnings and earnings projections); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 186–87 (4th Cir.2007) (discussing a corrective disclosure in the form of a complaint filed in a lawsuit alleging that defendants improperly booked revenue from sham "round-trip" transactions to improve financial statements); *Catogas v. Cyberonics, Inc.*, 292 Fed.Appx. 311, 313 (5th Cir.2008) (describing a defendant's press release authorizing its Audit Committee to conduct an in-

ternal investigation into stock-option practices); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F.Supp.2d 546, 548–49 (S.D.N.Y.2008) (describing the corrective disclosures as newspaper articles revealing the defendant's improper accounting practices); *Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 571 (N.D.Tex.2007) (referring to the defendant's restatement of financials for three fiscal years); *In re Apollo Group, Inc. Sec. Litig.*, No. 04–2147, 2008 WL 3072731 at *1–2 (D.Ariz. Aug. 4, 2008) (describing the corrective disclosures as newspaper articles reporting on a Department of Education's report that the defendant had violated Department regulations); *see also In re Metris Cos., Inc. Sec. Litig.*, 428 F.Supp.2d 1004, 1008, 1013–14 (D.Minn. Apr. 21, 2006) (describing the corrective disclosures as press releases or statements reducing earnings guidance or announcing losses, and later concluding that the plaintiffs' loss causation argument was "dubious"). While not determinative to the Court's conclusion, the Court notes that the July 8, 2002, press release merely indicates revenue guidance revisions.

public. It had been made aware of potential problems with Cyberonics stock-option accounting by the [previously reported] June 2006 investment-analyst report.").

In the alternative, plaintiffs argue that the July 8 press release **indirectly** discloses that deferred revenue, particularly in the MAI transaction, was improperly accounted for in violation of GAAP. In that case, however, the press release was not the first disclosure of such activity. Generally, a re-characterization of previously disclosed news cannot be a corrective disclosure for loss causation purposes. *E.g., In re Omnicom Group, Inc. Sec. Litig.,* 541 F.Supp.2d 546, 552 (S.D.N.Y.2008). Here, Retek cites two analyst reports from April 2002, indicating that the MAI deferred revenue write-off was pending or expected.

The Raymond James analysis determined that "[i]t is our understanding that the previous journal entry [debiting assets for $4 million and crediting the deferred revenue line $4 million for MAI stock value] would be reversed, which would reduce deferred revenue by $4 million." (Def. Retek's Supp. Mem., Docket No. 631, Ex. 167.) Further, Raymond James determined that "[b]y the end of 2002, we expect [Retek] to write off the investment in MAI." (*Id.*) Baird offered a similar analysis:

> One concern on the Street has involved Retek's relationship with MAI, an Asian-based retail exchange.... At the time of the transaction, Retek valued the equity stake at zero resulting in no impact to the balance sheet. In 2Q01, MAI obtained some VC funding and accounting rules dictated that Retek value its stake at $4 million, which was added to the other assets and deferred revenue lines on the balance sheet.... Given the state of affairs of the vast majority of BSB exchanges, we suspect there is a

good chance that sometime in 2002 Retek will have to take out the $4 million investment from the deferred revenue and other assets lines. However, there would be NO impact to the income statement or cash flow of Retek. We believe this is essentially a non-issue that may get more play in the market than it deserves.

(*Id.,* Ex. 169.)

The July 8 press release does not state anything different than the information that the analyst statements provide. In fact, the analyst reports give **more** detailed information than the press release, specifying the accounting treatment that Retek gave to the MAI stock. "[C]onfirmatory information—that information already known to the market—may **not** constitute such a corrective disclosure." *Catogas,* 292 Fed.Appx. at 314 (emphasis original) (citing *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 663 (5th Cir. 2004)). In this case, there is no "new, fraud-revealing analysis" in the subsequent press release disclosure. *In re Apollo Group, Inc. Sec. Litig.,* No. CV 04–2147, 2008 WL 3072731, at *3 (D.Ariz. Aug. 4, 2008).

Plaintiffs argue that what **might** happen and what **does** happen are two very different things. For example, here, the analyst reports state that they "expect" or "suspect" that Retek will write off MAI deferred revenue. Contrastingly, the July 8 press release actually states that the $4 million will be written off. Case law suggests, however, that this is not a necessary distinction.

In *In re Apollo Group, Inc. Securities Litigation,* 2008 WL 3072731, a report by the U.S. Department of Education preliminarily found that the defendant (a for-profit educational institution, the University of Phoenix) violated Department regulations. The defendant made public

statements contrary to the existence and contents of the Department report. Thereafter, various newspapers disclosed the contents of the report, but the market did not react significantly to the news. Later, the defendant's stock price fell significantly when an analyst issued statements providing further analysis of the Department report. The district court found that the subsequent analyst statements "were not necessary to reveal fraud in this case because they did not provide any new, fraud-revealing analysis." *In re Apollo,* 2008 WL 3072731, at *3.

This case is similar to *Apollo.* Here, the analyst reports all but assured the public that the $4 million dollar write-off of deferred revenue would occur, and there is no evidence of any significant drop in stock price after this revelation. The Retek press release was far less detailed than the analyst reports, and yet plaintiffs rely on distinguishing between what "might" happen and what "does" happen. In the end, the press release merely noted the write-off of MAI deferred revenue, without any substantive reasoning tending to suggest that a fraud caused the write-off. To show loss causation here, plaintiffs need to adduce evidence that the market reacted to new facts disclosed in the July 8, 2002, press release that revealed Retek's accounting treatment to be fraudulent. Plaintiffs fail to do so. The market understood the relevant truth three months before the issuance of the press release: MAI was in trouble and Retek was expected to write off $4 million in deferred revenue from MAI stock.

Because plaintiffs have not presented evidence of loss causation to satisfy their burden at summary judgment, Retek's motion for summary judgment as to the MAI venture is granted.

### b. The Sainsbury's/Accenture Account

Plaintiffs argue that Retek improperly recognized $10.5 million in revenue from the Sainsbury's transaction in 4Q01 and 1Q02 by asking Accenture to "pre-purchase" software intended for Sainsbury's, which made the payment contingent and refundable and therefore not properly recognizable as revenue. There is no direct disclosure in the July press release of the alleged misrepresentation or improper accounting for the A & P transaction. Plaintiffs argue, however, that the misrepresentation permitted Retek to "postpon[e] announcing a shortfall and raised cash flow expectations that were corrected on July 8." (Pl.'s Opp. Mem., Docket No. 65 at 75.)

Plaintiffs argue that the disclosures in the July 8 press release were corrective because they revealed Retek's "true financial condition." Plaintiffs rely on *Daou* and this Court's October 21, 2005, order, *Retek III,* 2005 WL 3059566, at *4, to argue that the "true financial condition" theory of disclosure is sufficient to defeat summary judgment. As discussed above, however, plaintiffs may not rely on this theory, alone, without supplying sufficient evidence to demonstrate that the disclosure revealed the relevant truth about the misrepresentation to the public.

Plaintiffs also rely on the Court's previous Order to argue that summary judgment should be denied because plaintiffs have demonstrated that there is a "temporal and subject matter relationship between the July 8 press release and the alleged fraudulent statements." *Id.* This reasoning, however, is used by the Court in the context of a motion to dismiss on the pleadings. As noted above, however, plaintiffs still bear the burden of producing evidence that the corrective disclosure began to reveal to the public the truth about the misrepresentation. The Court's Order

even references *Dura:* "There is thus a **possible temporal and subject matter connection** between the July 8 press release and the previous alleged misrepresentations that was missing in *Dura.*" *Retek III,* 2005 WL 3059566, at *4 (emphasis added). Reliance on this proposed standard, similar to reliance on the true financial condition theory, is by itself inadequate to survive a motion for summary judgment. Plaintiffs must adduce evidence of the link between the corrective disclosure, public awareness of the fraud, and a consequential drop in stock price. Plaintiffs' evidence falls far short of this standard.

Plaintiffs contend that *In re Motorola Securities Litigation* supports both rationales by stating that "a share price decline following an earnings warning can serve as a disclosure in which 'the relevant truth begins to leak out' even if it does not point to the previous representation and proclaim[ ] its falsity." (Docket No. 645, citing 505 F.Supp.2d 501, 540, 546 (N.D.Ill. 2007).) Plaintiffs' argument does not support their conclusion. Indeed, the *Motorola* court later held, "At most, the evidence indicates that Motorola issued the earnings warning at the same time that Defendants were aware of problems ... that might impact its earnings." *Id.* at 547. In granting summary judgment for defendants on a general "disclosure" of the relevant truth, the court continued, "there is no evidence suggesting that the earnings warning was issued **because of those concerns.**" *Id.* (emphasis added). Further, the *Motorola* court held that "mere temporal proximity does not establish causation." *Id.*

In sum, plaintiffs have not produced evidence that the public recognized a relationship between the reduced revenue guidance in the July 8 press release and the alleged misrepresentation in the Sains-bury's transaction, or that such link caused the July 9 stock drop. Moreover, there is no evidence that the public learned of any "relevant truth" in the July 8 press release—the press release did not say anything about accounting and plaintiffs fail to adduce evidence that the press release indirectly revealed the truth regarding such accounting problems. Notably, it appears that until this litigation commenced, there was no "disclosure" of **any** improper accounting practices for the A & P, IBM, EPAM, or Sainsbury's transactions. (Def.'s Supp. Mem., Docket No. 598, Gallagher Decl., Ex. 3 at 308:3–309:23.) Accordingly, the Court grants Retek's motion for summary judgment as to the Sainsbury's transaction.

#### c. The A & P Project

Plaintiffs allege that Retek overstated revenue from the A & P agreements by recognizing revenue under the percentage-of-completion method, and improperly recognizing 100% of the revenue when only 30% of the contract had been completed. Plaintiffs further allege that such accounting improperly raised cash flow expectations and masked revenue problems until the impropriety was indirectly disclosed when the true financial condition of the company was revealed in the July 8 press release. (Pl.'s Opp. Mem., Docket No. 655 at 74.)

Defendants again raise the argument that they have satisfied their summary judgment burden based on the July 8 disclosure of Retek's true financial condition, or the establishment of a "temporal and subject matter connection" between the alleged A & P fraud and the July 8 press release. Plaintiffs fail to demonstrate, however, that there is a fact question of loss causation for the jury regarding the A & P project, and Retek's motion is granted as to the A & P transaction.

### d. The IBM Alliance

Plaintiffs allege that Retek inflated reported revenues by including the $20 million Advance Payment under the MRA in Retek's financial results and thereby raised cash flow expectations and masked revenue problems. Further, plaintiffs claim that Retek previously represented that it anticipated closing $35 million in "pre-sale" licenses to IBM, and that Retek failed to do so in part because the Retek–IBM relationship had broken down.

Plaintiffs have not established evidence that the public became aware on July 8 that the positive IBM statements and MRA accounting were fraudulent, and that such awareness caused the stock price drop on July 9. Accordingly, Retek's motion is granted as to their IBM alliance allegations.

### e. The EPAM/HVI Venture

Plaintiffs allege that the $8 million HVI loan and transaction with EPAM was a sham deal that, when documented in Retek's revenue numbers in its financial statements, distorted customer demand and future cash flows. Plaintiffs further contend that this error was corrected in the July 8 press release.

Because there is no claim that the EPAM/HVI accounting was **directly** disclosed in the July 8 press release, plaintiffs must present evidence that this alleged misrepresentation was indirectly disclosed in the press release and that Retek's stock dropped as a result of this revelation. To do so, plaintiffs argue only that the press release revealed Retek's true financial condition. Moreover, plaintiffs fail to present evidence that the public became aware of the allegedly fraudulent EPAM/HVI accounting and that the public's awareness caused the July 9 stock-price drop. Accordingly, Retek's motion is granted as to the EPAM/HVI venture.

### 3. Conclusion on Loss Causation

In sum, plaintiffs do not establish evidence that the July 8 press release revealed any corrective information about Retek's accounting for the MAI project. Even if the press release **could** be considered a corrective disclosure for the MAI transaction, the evidence suggests that the press release merely recharacterized or repeated information that was made publicly available by analysts months before.

Further, as outlined above, plaintiffs' reliance solely on the true financial condition theory to establish indirect disclosure of Retek's alleged misrepresentations is fatal to their allegations relating to the Sainsbury's, A & P, IBM, and EPAM/HVI ventures. Indeed, even plaintiffs' expert witness, Dr. Scott Hakala, concedes that until the original complaint was filed, there was no disclosure such that the market became aware that Retek had committed improper or fraudulent practices regarding those four ventures. (Def.'s Supp. Mem., Docket No. 598, Gallagher Decl., Ex. 3 at 308:3–309:23.)

As a consequence, Retek's motion for summary judgment is granted in all respects because plaintiffs have failed to produce evidence such that there is a triable fact question for the jury on loss causation. Thus, the Court need not address Retek's argument that plaintiffs failed to disaggregate fraud from non-fraud factors in establishing loss causation.

Further, because plaintiffs fail to establish an essential element of their § 10(b) and SEC Rule 10b–5 claims, the Court need not address the parties' falsity and scienter arguments. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *cf. In re Metris Cos., Inc. Sec. Litig.,* 428 F.Supp.2d 1004, 1014 (D.Minn.2006) ("Having found insufficient evidence of material statements and scienter, the Court need not reach the issue of loss causation.").

## III. CONTROL PERSON LIABILITY

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b) and Rule 10(b)–5 "shall also be liable jointly severally with and to the same extent as such controlled person is liable." 15 U.S.C. § 78t. Section 20(a) requires plaintiffs to prove that (1) an alleged control person actually exercised control over the general operations of the primary violator; and (2) the alleged control person possessed but did not necessarily exercise the power to determine the specific acts or omissions upon which the underlying violation is predicated.

█ Plaintiffs have not satisfied their burden that Retek's alleged misrepresentations caused plaintiffs' losses under Section 10(b) or SEC Rule 10b–5. As a result, plaintiffs cannot establish any primary violation or violator and individual defendants' motions for summary judgment on plaintiffs' § 20(a) control person liability claims are granted.[5] *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 904 n. 20 (8th Cir.2002) ("The § 10(b) and Rule 10b–5 claims are predicates to § 20(a) liability.... [This theory] cannot go forward if the predicate claims are dismissed." (citations omitted)); *see also Deviries v. Prudential–Bache Sec., Inc.*, 805 F.2d 326 329 (8th Cir.1986).

## IV. MOTION TO EXCLUDE THE TESTIMONY OF DR. SCOTT HAKALA

Defendants jointly move to exclude the expert testimony of plaintiffs' expert Dr. Scott Hakala, arguing that Dr. Hakala's testimony violates *Daubert*, 509 U.S. 579, 113 S.Ct. 2786 (1993), and Supreme Court loss causation principles. It is unnecessary, however, to rule on the exclusion of Dr. Hakala's testimony at this stage of the litigation and the Court denies defendants' motion as moot.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that

1. Defendant Retek Inc.'s Motion for Summary Judgment [Docket No. 591] is **GRANTED.**

2. Individual Defendants James B. Murdy, John Buchanan, Steven D. Ladwig, and Gregory A. Effertz's Motion for Summary Judgment [Docket No. 588] is **GRANTED.**

3. Individual Defendant Jeremy P.M. Thomas's Motion for Summary Judgment [Docket No. 599] is **GRANTED.**

4. Defendants Retek Inc., James B. Murdy, John Buchanan, Steven D. Ladwig, and Gregory A. Effertz's Motion to Exclude the Testimony of Dr. Scott Hakala [Docket No. 595] is **DENIED AS MOOT.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

5. Defendant Jeremy P.M. Thomas, in his *pro se* motion, requests that the Court "penalize Claimants for the[ir] malicious use of process" and "penalize Claimants for their destruction of Retek as an independent company." There being no basis in law for these requests, the Court denies these requests for relief.